# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:08 MD 1932

| | |
|---|---|
| IRENE GRACE, )<br>)<br>      Plaintiff, )<br>)<br>v. )<br>)<br>FAMILY DOLLAR STORES, INC., )<br>)<br>      Defendant. )<br>_____ ) | ORDER |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. No. 324); Plaintiff's Response in Opposition (Doc. No. 435); and Defendant's Reply (Doc. No. 484).[1] For the reasons set forth below, the motion is **GRANTED**.

---

[1] Plaintiff's case comes before this Court as part of a proposed collective action. On September 6, 2007, this Court granted Defendant's Motion to Strike Collective Action Allegations. (3:06cv306, Doc. No. 78.) On July 9, 2009, this Court granted Defendant's Motion for Summary Judgment as to the named Plaintiff in this case, Irene Grace, and dismissed her from this action. (3:08md1932, Doc. No. 172.) Ms. Grace appealed both orders to the Fourth Circuit Court of Appeals. The Court of Appeals held that Ms. Grace was a manager and therefore affirmed this Court's judgment in favor of Family Dollar Stores, Inc. *See Grace v. Family Dollar Stores Inc.*, 637 F.3d 508 (4th Cir. 2011).

# FACTS [2] [3]

Plaintiff, John E. Gersch ("Gersch") began working for Family Dollar in October of 2002 and was promoted to store manager in Kingman, Arizona, (Store 4377) on November 10, 2002. (Gersch Dep. 31:10-25.) As store manager in Kingman, Gersch's starting salary was $500 per week. (*Id.* at 49:6-11.) On August 10, 2003, Gersch transferred to another store in Kingman, Arizona (Store 4684) and received a pay increase to $600 per week. (*Id.* at 49:6-25, 50:1-3.) He received another raise to $630 a week before ending his employment with Family Dollar in March of 2004. (*Id.* at 50:20-25.)

In his deposition, Gersch testified that he was an "effective leader" and communicated well with his employees. (*Id.* at 72:25, 73:1-4.) In fact, he stated, "ultimately I'm the No. 1 guy." (*Id.* at 155:12.) Gersch motivated and coached his employees in order to revitalize a deteriorating store and to maximize his store's efficiency. (Gersch Dep. at 38:4-7, 139:1-8.) As store manager, he was responsible for administering company training manuals ("strands") to

---

[2] To the extent Plaintiff makes any factual assertions based on the decision in *Morgan v. Family Dollar Stores, Inc.*, the Court will disregard such assertions. The Court will also disregard exhibits based on the *Morgan* case. In *Grace v. Family Dollar Stores, Inc.*, the Fourth Circuit Court of Appeals rejected Ms. Grace's argument that the facts in *Morgan* and in her case were identical; similarly, this Court finds no basis to support the assumption that the facts between Plaintiff's case and the *Morgan* case are the same. *See Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508, 518 (4th Cir. 2011) (finding that potential variations between store size, store inventory, and the individual responsibilities of managers, as well as differences in managers' performance of exempt and nonexempt duties and the supervisory activity of district managers, precluded Plaintiff's argument that the facts in *Morgan* and in her case were identical).

[3] The Court notes that Plaintiff's declaration was prepared after Plaintiff's deposition and on many occasions directly contradicts his sworn testimony. Plaintiff cannot create a dispute about a fact contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for "it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (internal quotation marks and alterations omitted) (quoting *Halperin v. Abacus Tec. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997); *see also Waste Mgmt. Holdings, Inc. V. Gilmore*, 252 F.3d 316, 341 (4th Cir. 2001); *Rohrbough v. Wyeth Labs.*, 916 F.2d 970, 975-76 (4th Cir. 1990); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). To the extent that Plaintiff's deposition testimony and later affidavit are inconsistent, the Court will disregard the affidavit and rely on the testimony he gave in his deposition, where he was examined at length about his responsibilities as a manager of a Family Dollar Store. *See Grace*, 637 F.3d at 513.

ensure his associates were properly trained in their respective positions. (*Id.* at 40:1-7, 109:17-20.) Furthermore, he always considered his employees' availability when creating the store's weekly work schedule. (*Id.* at 111-112.) He also approved shift swaps between employees. (*Id.* at 113:19-24.)

Gersch strived to exceed his store's sales and profitability goals. (*Id*. at 41:4-7.) He was held accountable for controlling his store's shrink, maintaining proper inventory on his shelves, and marking down damaged products. (*Id*. at 41:18-25, 42:1-16.) In fact, he admitted that his performance evaluations depended on the success of the three aforementioned tasks. (Gersch Dep. at 77:21-25, 78:1-5.) Gersch was also responsible for completing his store's paperwork, including cycle counts, markdown reports, D100s, cashier records, warehouse transfer records, and store to store transfer records. (*Id.* at 151:7-25, 152:1-20.)

Gersch recommended three prospective employees when he first began his management position, and his district manager ("DM") hired all three of the employees Gersch recommended. (*Id.* at 82:6-25, 83.) Aside from the first three employees hired, when a position became available, Gersch filtered through a stack of completed applications and contacted his choice candidates. (*Id.* at 85:12-25, 87:24-25, 88, 89:1-9.) He then administered the Stanton test, which required a passing score, prior to contacting his DM with the names of who he believed were the best candidates. (*Id.* at 86:1-10, 90:5-11.) Once given permission from his DM, Gersch interviewed the prospective employees. (*Id.* at 91:13-25, 92:1.) He testified that honesty was a fundamental quality he looked for in a candidate. (Gersch Dep. at 89:19-22.)

After screening, interviewing, and administering the Stanton test, Gersch called his DM and notified him as to whether he felt the candidate was suitable for hire. (*Id.* at 86:7-10.) He subsequently administered the drug test and submitted the background check to the corporate

3

office. (*Id.* at 92:13-25, 93:1-5.) Gersch testified that his DM always considered his recommendations, but they were not always followed. (*Id.* at 101:1-5.) Gersch admitted that he also recommended the new-hires' rate of pay on several occasions, and that this DM followed these recommendations. (*Id.* at 103: 14-16, 104:4-7, 105:4-25.) Additionally, he initiated the termination of two employees before seeking approval from his DM. (*Id.* at 140-146.) Gersch's DM approved both of these terminations after the fact. (Gersch Dep. at 140-146.)

Gersch testified that, in the beginning, his DM visited Store 4377 two to three times a week, but he scaled back to once a week visits when the store was up and running. (*Id.* at 62:15-21.) Mark Tessier, DM of Store 4684, visited once every two weeks and lived over two hours away from the store. (*Id.* at 64:16-25, 65:1-9.) Mr. Tessier oversaw between eight and sixteen stores during the time Gersch managed Store 4684. (*Id.* at 65:10-14.) Gersch testified that he received a daily uniform email from Mr. Tessier addressed to the entire district; however, Mr. Tessier called Gersch's store five to six times a day. (*Id.* at 65:15-25, 66, 67.)

In his deposition, Gersch admitted he worked anywhere from fifty-three to eighty hours a week while managing Store 4377. (*Id.* at 120:17-25, 121:1-5.) He admitted working between fifty-five and sixty-three hours a week while managing Store 4684; however, he testified that he did not clock in all of his hours per instructions from his DM. (Gersch Dep. at 122:5-15.) During his time at Store 4377, Gersch had at least four employees on his team, and at Store 4684 he had between six and eight employees. (*Id.* at 51:17-25, 52, 56:2-13.) He conceded that his employees totaled at least eighty hours of employment a week at each of the stores he managed. (*Id*. at 55, 56.) Gersch asserted that his assistant managers earned between $7 and $9 an hour but usually less than $8 an hour. (*Id.* at 53:6-24.) He also asserted that his hourly clerks and stockers earned around $5.35 an hour. (*Id.* at 54:6-25, 55:1.) Michelle DeBrocq ("DeBrocq"), a

4

Litigation Paralegal for Family Dollar, Inc., confirmed that there were at least eighty work hours per week reported by hourly employees in stores where Gersch was the assigned store manager. DeBrocq's review of Family Dollar's records confirms that, of the twenty-four employees working in the stores where Gersch was the store manager during the relevant time period, twenty-two employees earned $7.00 or less per hour and none made more than $7.35 per hour. (DeBrocq Decl. ¶ 7-8.)[4] Gersch testified that, as store manager, he apportioned work among his employees. (Gresch Dep. 127-129.)

## STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met the initial burden, "the non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). This is particularly important where the nonmoving party bears the burden of proof. *Hughes*, 48 F.3d at 1381. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. If the evidence is merely

---

[4] The Court is aware that Plaintiff objects to the admissibility of DeBrocq's declaration. However, by Order dated August 10, 2011, the undersigned concluded that the declarations of Family Dollar employees regarding the "two full time employees or their equivalent" and "significant salary difference" prongs of the executive exemption were admissible. Significantly, Plaintiffs failed to file a response to Family Dollar's supplemental briefing on this issue despite being given 30 days to do so by the Court. (Doc. No. 590.)

colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

When considering summary judgment motions, courts must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). In reviewing the whole record, the Court must remember to "disregard all evidence favorable to the moving party that the jury is not required to believe" and therefore only "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that [the] evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## **DISCUSSION**

The Fair Labor Standards Act ("FLSA") requires that an employee receive overtime pay if he or she works more than forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA, however, exempts from this requirement "any employee employed in a bona fide executive…capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations which further describe and interpret the scope of this exemption.

The pre-2004 regulations set forth both a "short" and "long" test for determining whether an employee qualifies as an exempt executive.[5] *See* 29 C.F.R. § 541.1 (pre-2004). The short test

---

[5] The Court notes that the current regulations went into effect on August 23, 2004. Plaintiff ended his employment with Family Dollar in March of 2004. (Gersch Dep. 50:23-25.) Therefore, the current regulations are inapplicable. The regulations in effect prior to August 23, 2004 (the pre-2004 regulations) are the regulations this Court will follow.

is used for employees who are compensated on a salary basis at a rate of at least $250 per week.[6]
29 C.F.R. § 541.1(f) (pre-2004). Under the short test, an employee qualifies as an executive if
(1) the employee's primary duty consists of the management of the enterprise and (2) includes
the customary and regular direction of the work of two or more other employees. 29 C.F.R. §
541.119(a) (pre-2004); 29 C.F.R. § 541.1(f) (pre-2004).

### 1. Family Dollar Satisfies the Salary Basis Test

Gersch earned a salary of more than $250 per week during the relevant time period.
Gersch's starting salary as a manager was $500 per week, and he was earning $630 a week by
the end of his employment. (Gersch Dep. 49:6-11, 50:20-25.) He also received $2,717.13 in
bonuses in November 2003. (*Id.* at 60:7-13.) Since Gersch earned a salary of more than $250
per week for the duration of his employment as a manager, the short test is the appropriate
method for determining whether he was properly classified as exempt.

### 2. Family Dollar Satisfies the Primary Duty Test

The regulations provide guidance as to how an employee's primary duty may be
determined. The regulations instruct the determination should be "based on all the facts in a
particular case." 29 C.F.R. § 541.103 (pre-2004). The pre-2004 regulations set forth five factors
to consider in this analysis: (1) the amount of time spent in the performance of managerial
duties; (2) the relative importance of the managerial duties as compared with other types of
duties; (3) the frequency with which the employee exercises discretionary powers; (4) the
employee's relative freedom from supervision; and (5) the relationship between the employee's

---

[6] The "long" test, which includes a total of six qualifications, is found in the pre-2004 regulations and is applicable if the employee earns less than $250 a week. *See* 29 C.F.R. §541.1(a)-(f) (pre-2004). Section 541.1(f) states that an employee who is compensated for his services on a salary basis of at least $250 per week and who satisfies the qualifications promulgated by sections 541.1(a)-(b) shall be deemed to meet all other requirements under that section. 29 C.F.R. § 541.1(f) (pre-2004).

7

salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103 (pre-2004).

Upon consideration of the five factors identified for determining whether Gersch's primary duty was management, the Court concludes that the factors are readily satisfied.

### a. The Amount of Time Spent in Performance of Managerial Duties

Gersch cannot overcome the exemption by claiming he spent the majority of his time performing non-managerial duties. The regulations define primary duty as the "major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103 (pre-2004). The regulations emphasize, however, that "time alone…is not the sole test" and that exempt executives are not required to spend more than fifty percent of their time performing exempt work if other factors support the conclusion that management is their primary duty. *Id.; see also Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508, 515 (4th Cir. 2011). The regulations also provide a list of "management" activities, which include but are not limited to:

> Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property.

29 C.F.R. § 541.102(b) (pre-2004).[7] In Gersch's deposition, he testified that he regularly

---

[7] The current regulations include the following two additional examples: planning and controlling the budget and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102. As previously stated, however, the Court is following pre-2004 regulations.

performed almost every one of these management activities. (Gersch Dep. 38-42, 73, 87-103, 105, 108-16, 122-23, 139-40, 147-52, 158, 165-66.)

In addition, as store manager, Gersch admits he was ultimately responsible for running the store; although his store employees worked as a "team," he was the team leader and "No. 1 guy." (Gersch Dep. 63, 72-73, 133-34, 155, 169-71, 197-98.)

Moreover, concurrent performance, or multi-tasking, of exempt and nonexempt work is recognized as a managerial duty by the DOL's regulations. The regulations give an example of an employee who performs non-exempt tasks and exempt tasks concurrently, stating that the employee will be considered to have management as his primary duty, although he spends more than 50 percent of his time performing non-exempt tasks, where "[w]hile engaged in such work he supervises other employees . . . handles customer complaints . . . or performs other management duties as the day to day operations require." 29 C.F.R. § 541.103 (pre-2004). In discussing this issue in *Grace*, the Fourth Circuit Court of Appeals stated, "it is misleading simply to add up the time that [Plaintiff] spent unloading trucks, stocking inventory, running cash registers, or sweeping floors and conclude thereby that she was merely a clerk and not a manager." *Grace,* 637 F.3d at 516.

In *Grace*, the Forth Circuit found the plaintiff "was performing management duties whenever she was in the store, even though she also devoted most of her time to doing the mundane physical activities necessary for its successful operation." *Grace,* 637 F.3d at 517. Similar to the plaintiff in *Grace*, Gersch also performed his non-managerial work concurrently with his exempt managerial work. For example, Gersch, while assisting other employees with the unloading of trucks and the stocking of shelves, would also observe his employees at work to make sure they were performing their tasks correctly. (Gersch Dep. 134:17-25, 135, 136:1-11.)

9

In addition, Gersch would often have to leave whatever task he was performing in order to attend to managerial duties, such as resolving customer complaints, correcting employee mistakes, addressing shoplifters, or assisting in employee training. (*Id.* at 108-09, 133-36, 147-48, 165-166.) In fact, Gersch admitted that, even if he was "stocking the store anywhere from 70 to 80 percent of the time," he was still "managing a hundred percent of the time." (*Id.* at 133:19-24.)

### b. The Relative Importance of the Managerial Duties as Compared with Other Types of Duties

Gersch's managerial duties were more important than the other duties he performed because they were critical to the operation of the store. In *Grace*, the plaintiff's managerial tasks, which included filling out paperwork, hearing customer complaints, working with employees on their schedules, and collecting cash, were critical to the operation of the store, as "[*t*]*here was no one else at the site to direct these actions*." *Grace*, 637 F.3d at 517 (emphasis in the original). Similarly, Gersch was responsible for, among other things, handling customer and employee complaints, maintaining store safety, taking care of store paperwork, controlling shrink, and scheduling employees. (Gersch Dep. 41:18-25, 42:1, 73, 110:3-25, 111, 112:1-16, 147-52, 158, 165:22-24.) He was also responsible for maintaining the store budget. (*Id.* at 158:19-25, 159-160.)

Gersch's bonus and performance evaluations were directly based on his ability to handle these responsibilities. While Gersch does argue that he was under the direct supervision of the district manager, he nonetheless stated that the district manager came to the store only once every two to three weeks – not enough to direct the managerial tasks. (*Id.* at 62:15-21.) Thus, Family Dollar Stores 4377 and 4684 could not have operated successfully without the managerial functions performed by Gersch.

### c. Frequency With Which the Employee Exercises Discretionary Power

Gersch frequently exercised discretion in performing his store manager duties. Gersch interviewed, performed background tests, provided hiring recommendations, completed new hire paperwork, and trained his new employees. (*Id.* at 82-103, 105, 108-116, 126, 165-66.) Although Gersch alleges his DM made the hiring decisions, Gersch admitted he personally recommended three employees when he first began as store manager, and his DM accepted all three recommendations. (*Id.* at 82:6-25, 83.) Gersch was also responsible for deciding when to discipline employees, and he fired at least two employees prior to confirming the decision with his DM. (*Id.* at 140-146.) Furthermore, Gersch would change the hours on the employee schedule to fit the needs of his store. (Gersch Dep. at 109-116.) In changing the schedule, Gersch would consider such things as the availability of his employees, scheduling conflicts, and expected sales. (*Id.* at 109:21-25, 110-113.) Furthermore, Gersch decided how to apportion work among his employees and verified that each task was completed. (*Id.* at 127:10-11, 129:1-5.)

All of these tasks, like the managerial tasks performed by the plaintiff in *Grace*, involved "discretionary acts inherent in being responsible for the successful operation of a retail store." *Grace*, 637 F.3d at 517. Although he performed certain nonexempt work, Gersch had the discretion and flexibility to choose what tasks to perform himself and what tasks to delegate to his employees. (Gersch Dep. 127-31.) Thus, the fact that Gersch chose to perform certain nonexempt work does not defeat the exemption because he decided how to apportion the work between himself and other employees. His performance of the nonexempt work was done, in fact, at his own discretion. Likewise, although Family Dollar maintains certain policies and

11

procedures for the sake of consistency, Gersch exercised a high level of discretion in deciding how to execute these policies and procedures.

### d. Relative Freedom from Supervision

Relative freedom from supervision does not demand complete freedom from supervision. In *Grace*, the Fourth Circuit Court of Appeals found the plaintiff to be relatively free from supervision where the plaintiff's supervising district manager typically visited the store once every two to three weeks. *Grace*, 637 F.3d at 517. The court also noted, apart from his supervision, which was not uncharacteristic for any retail operation, the district manager was not a "micro-manager who constantly was looking over her shoulder." *Id*. The supervision of seventeen stores would hardly permit him to micro-manage all of them. *Id*.

Gersch testified that his DM visited two to three times per week at the beginning of his time as manager of Store 4377; after the store was up and running, however, the DM scaled back his visits to once a week. (Gersch Dep. 62:15-21.) Gersch's DM at Store 4684, Mark Tessier, visited once every two weeks and lived over two hours away. (*Id.* at 64:16-18, 65:6-9.) Gersch admitted that his DM could "not be there on the ground to see that things were done in the store," and that he had to rely on others to make sure the work was completed. (Gersch Dep. 68:4-10.) Although Mr. Tessier sent daily uniform emails to every store in his territory, which ranged anywhere from eight to sixteen stores (*Id.* at 65:10-25, 66:1-5), and called five to six times daily, often times to Gersch's personal cell phone (*Id.* at 67:10-25, 68), courts have found that "frequent, even daily exchange of e-mail and phone communications" between store managers and district managers "does not equate to exacting supervision." *See Thomas v. Speedway SuperAmerica LLC*, 506 F.3d 496, 508 (6th Cir. 2007).

Moreover, courts have found that employees were relatively free from supervision in

circumstances where the exempt executive was subject to substantially greater oversight than Gersch. In *Thomas*, the plaintiff's supervising district manager typically visited the store once or twice a week and communicated frequently by both telephone and email. The Sixth Circuit noted, "In addition to stringent managerial oversight, Speedway has also adopted detailed company policies and standardized operating procedures, as an additional means of fostering consistency through its multi-store organization." *Id.* at 499. Nevertheless, the Sixth Circuit found the plaintiff was relatively free from supervision, recognizing that the factor "does not demand complete freedom from supervision." *Id.* at 507. Although Gersch asserts he had to have his district manager's approval for everything, Gersch's testimony regarding each district manager's nominal level of micro-management indicates otherwise, proving Gersch was relatively free from supervision. (Gersch Dep. 63:10-15.)

    e.  **Relationship Between Salary and Wages Paid to Other Employees for the Kind of Nonexempt Work Performed by the Supervisor**

To determine the relationship between a managerial salary and wages paid to nonmanagerial employees, the Fourth Circuit considered, first, whether the manager earned more, in absolute terms, than nonmanagerial employees and, second, whether the manager was a "profit center." *Grace*, 637 F.3d at 517. This second consideration asks whether the manager had the ability to influence the amount of his or her compensation. *Id.*

Gersch earned more in absolute terms than his non-exempt employees. He started at $500 a week, received a raise to $600 a week when he transferred stores, and ultimately earned $630 per week. (Gersch Dep. 49-51.) Meanwhile, he testified that his employees earned between $5.35 and $9 an hour, but likely no more than $8. (*Id.* at 53-54, 59.) Gersch also

testified that a store manager "[a]bsolutely . . . made more money" than an assistant store manager, and that he was the only store employee who was eligible for, and in fact received, a bonus. (Gersch Dep. 60-61, 167.)

Michelle DeBrocq, a Family Dollar employee, calculated that the highest earning employee at any of Gersch's stores besides Gersch himself earned $7.35/hour. (DeBrocq Decl. ¶ 8.) Gersch testified that he worked between fifty-three hours and a high of eighty hours per week while managing Store 4377 and between fifty-five hours and sixty-three hours per week while managing Store 4684. (Gresch Dep. at 120, 122.) According to Family Dollar's records, excluding the weeks that Gersch logged zero work hours, Gersch worked an average of 60.56 hours per week. (DeBrocq Decl. ¶ 6.) Setting aside his bonus payments, this results in an average hourly wage of $10.40 per hour. The non-exempt employees working at Gersch's stores, even using the highest hourly wage for those employees whose wages changed over time, received an average hourly wage of $6.11 per hour. (*Id.* at ¶ 8.) If an hourly employee making the average hourly wage of $6.11 per hour worked 60.56 hours, he or she would earn approximately $432.83 per week. These calculations reveal a significant difference in wages between Gersch and the non-exempt employees.[8]

Moreover, Gersch, like the plaintiff in *Grace*, was a "profit center" because his

---

[8] Even if the Court relied solely on Gersch's testimony, Gersch admitted he was the highest paid employee in the store a vast majority of the time. (Gersch Dep. 60:3-5.) In fact, looking solely at Gersch's testimony and calculating his hourly wage by applying the lower end of the range of hours worked while managing Store 4377 (fifty-three), Gersch earned $9.40 per hour. Averaging that with his hourly wage for the high end (eighty hours–recorded on once), yields $7.82 per hour. While managing Store 4684, Gersch earned between $9.52 per hour and $11.45 per hour, both of which are significantly higher than his associates ($9.52 is calculated by dividing the greatest amount of hours worked (63 hours) from his initial salary at Store 4684 ($600), and $11.45 is calculated by dividing the least amount of hours worked (55 hours) from his final salary at Store 4684 ($630)). Additionally, Gersch admitted that he received a $2700 bonus during his time as store manager, which he shared with the previous store manager because the year was split. (Gersch Dep. 60:7-25.)

performance evaluations and bonus depended on his store's profitability. (Gersch Dep. 61:23-25, 62:1-4, 77:21-25, 78:1-5.)

### 3. Customary and Regular Direction of the Work of Two or More other Employees

The regulations require an employee customarily and regularly direct the work of two or more other employees to qualify as an executive. 29 C.F.R. § 541.100(f) (pre-2004). Gersch testified that he maintained a staff of at least four employees. (Gersch Dep. 50-52, 56.) In fact, he admitted in his deposition that he always had at least eighty hours of payroll a week at both stores. (*Id.* at 55-57.) Gersch's testimony makes it apparent that he customarily and regularly directed at least two employees. Furthermore, Family Dollar's records reflect that Gersch managed at least eighty employee hours 100% of the time he was a store manager. (DeBrocq Decl. ¶ 8.)

## CONCLUSION

Considering the facts in the light most favorable to the non-moving party, the Court finds that Family Dollar has satisfied the DOL regulations qualifying Gersch as an exempt executive under the FLSA. Therefore, Family Dollar is entitled to judgment as a matter of law.

## ORDER

IT IS ORDERED that:

(1) Defendant's Motion for Summary Judgment is GRANTED and Plaintiff John Gersch is dismissed;

(2) The Court finds that there is no just reason to delay finding of final judgment for Family Dollar with regard to Plaintiff John Gersch's claim against Family Dollar;

(3) The Clerk is directed to enter final judgment, pursuant to Rule 54(b), for Family Dollar with regard to Plaintiff John Gersch.

**SO ORDERED.**

Signed: September 26, 2011

Graham C. Mullen
United States District Judge