**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:08 MD 1932**

| | | |
|---|---|---|
| **IRENE GRACE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **FAMILY DOLLAR STORES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. No. 214); Plaintiff's Response in Opposition (Doc. No. 312); Defendant's Reply (Doc. No. 395); and Defendant's Supplements to its Motions (Doc. No. 784).[1] For the reasons set forth below, the motion is **GRANTED**.

**FACTS** [2]

[1] Plaintiff's case comes before this Court as part of a proposed collective action. On September 6, 2007, this Court granted Defendant's Motion to Strike Collective Action Allegations. (3:06cv306, Doc. No. 78). On July 9, 2009, this Court granted Defendant's Motion for Summary Judgment as to the named Plaintiff in this case, Irene Grace, and dismissed her from this action. (3:08md1932, Doc. No. 172). Ms. Grace appealed both orders to the Fourth Circuit Court of Appeals. The Court of Appeals held that Ms. Grace was a manager, and therefore affirmed this Court's judgment in favor of Family Dollar Stores, Inc. *See Grace v. Family Dollar Stores Inc*., 637 F.3d 508 (4th Cir. 2011).

[2] To the extent Plaintiff makes any factual assertions based on the decision in *Morgan v. Family Dollar Stores, Inc*., the Court will disregard such assertions. The Court will also disregard exhibits based on the *Morgan* case. In *Grace v. Family Dollar Stores, Inc.*, the Fourth Circuit Court of Appeals rejected Ms. Grace's argument that the facts in *Morgan* and in her case were identical; similarly, this Court finds no basis to support the assumption that the facts between Plaintiff's case and the *Morgan* case are the same. *See Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508 (4th Cir. 2011) (finding that potential variations between store size, store inventory, and the individual responsibilities of managers, as well as differences in managers' performance of exempt and nonexempt duties and the supervisory activity of district managers, precluded Plaintiff's argument that the facts in *Morgan* and in her case were identical).

Plaintiff, Jewell Ray Belford, began working at Family Dollar in June 1999 as the store manager of its store in Cornelia, Georgia. (Doc. No. 215, Belford Dep. at 57-58.)[3] Over the course of his employment Belford also worked at stores in Cleveland, Georgia, and Athens, Georgia. (*Id*. at 81-82.) Belford was terminated from his employment with Family Dollar in February of 2005.[4] (Doc. No. 215, Sundberg Decl. ¶ 10.) Between February 8, 2004 and February 21, 2004, Belford was paid a salary of $722.80 per week. (*Id*. at ¶ 4.) He then received a pay increase to $744.69 per week which he received throughout most of the remainder of his employment with Family Dollar. (*Id*.) The only exception was between October 2004 and January 2005 when he earned $950 per week. (*Id*.) Belford earned bonuses of $587.60 in 1999, $659.61 in 2000, $85.03 and $2,633.07 in 2001, $3,186.56 in 2002, $3,330.15 in 2003, and $3,628.88 in 2004, bonuses for which nonexempt employees were not eligible. (*Id*. at ¶ 9.) Belford worked an average of 54.49 hours per week. (Doc. No. 784, DeBrocq Decl. ¶ 4.)

The record shows the hourly employees working at Belford's store, even using the highest wage for those employees whose wages changed over time, received an average hourly wage of $6.40 per hour. (Doc. No. 215, Sundberg Decl. ¶ 7.) Family Dollar's records reflect

---

[3] The Court notes that Plaintiff's declaration was prepared after Plaintiff's deposition and on many occasions directly contradicts his sworn testimony. Plaintiff cannot create a dispute about a fact contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for "it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (internal quotation marks and alterations omitted) (quoting *Halperin v. Abacus Tec. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997); *see also Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 341 (4th Cir. 2001); *Rohrbough v. Wyeth Labs.*, 916 F.2d 970, 975-76 (4th Cir. 1990); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). To the extent that Plaintiff's deposition testimony and later affidavit are inconsistent, the Court will disregard the affidavit and rely on the testimony he gave in his deposition, where he was examined at length about his responsibilities as a manager of a Family Dollar store. *See Grace*, 637 F.3d at 513.

[4] Belford filed his opt-in consent form on February 9, 2007. Accordingly, February 9, 2004, or three years prior to his opt-in date, through the end of his employment in February 2005, represents the longest possible relevant time period for Belford's claims in this action.

that Belford managed at least 80 employee hours 98.15% of the time he was a store manager during the relevant time period. (*Id*. at ¶ 6.)

Belford contends that he devoted 75-80% of his time to performing nonexempt work, but he was also responsible for the overall management of the store for the entire time he was in the store. (Doc. No. 215, Belford Dep. at 35, 224.) Despite the fact that he may have been doing manual tasks, Belford admits that he was always "top dog" in the store and was managing the store at all times, even though he may not feel like he was. (*Id*. at 87, 140-41.) Belford's managerial tasks included training employees (*Id*. at 113), maintaining sales records and ensuring the accuracy of payroll records (*Id*. at 99.), and promoting store safety (*Id*. at 112), and were critical to the operation of the store. Belford decided how to interview applicants (Doc. No. 215, Belford Dep. at 164-65); how to adjust the schedule (*Id*. at 137); how to conduct performance evaluations for employees and assistant managers (*Id*. at 198-200, 209-10); and how to apportion work among the employees (*Id*. at 143); while at the same time, satisfying customers.

As store manager, Belford reported to a district manager. During the majority of Belford's time at Family Dollar, Penny Sundberg was his district manager. Belford testified that Sundberg only visited his store about three times a month. (Doc. No. 215, Belford Dep. at 138.) Belford also testified that he spoke on the phone with Sundberg daily. (*Id*.) Family Dollar's records indicate that Sundberg was responsible for 19 stores across a dozen counties. (Doc. No. 215, Sundberg Decl. ¶ 3.) The district spanned approximately 102 miles north to south, and approximately 94 miles east to west. (*Id.*)

Belford testified that he was actively involved in the interviewing and employee screening process, administering applicant tests, and ensuring that all pre-employment drug

screening and paperwork were properly completed. (Doc. No. 215, Belford Dep. at 109, 164-65, 167, 169, 174-75.) Belford made recommendations to his district manager regarding promoting or demoting employees, which the district manager often followed. (*Id.* at 152-53, 226-27.) Belford testified that he also completed separation documents and was involved in employee terminations. (*Id.* at 216-18.)

## STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met the initial burden, "the non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). This is particularly important where the nonmoving party bears the burden of proof. *Hughes*, 48 F.3d at 1381. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. If the evidence is merely

[5] Plaintiff argues that the fact-intensive nature of the FLSA exemption analysis renders the issue inappropriate for summary judgment, and that a grant of summary judgment would require this Court to make impermissible credibility determinations. The Court finds both of these arguments unconvincing. First, the Fourth Circuit has considered the fact intensive nature of the FLSA exemption determination and has found that the question is one of law. *See, e.g., Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004) (determination of whether an employee qualifies as exempt is ultimately a legal question); *Jones v. Virginia Oil Co., Inc.*, 69 Fed.Appx. 633, 637-38 (4th Cir. 2003) (plaintiff was exempt as a matter of law). Accordingly, the question is appropriately addressed on summary judgment. Second, the Court will not have to make any credibility determinations because the Defense relies on Belford's own testimony regarding his duties and responsibilities, as well as other documents produced during discovery. Therefore, the Court will not have to weigh one witness' credibility against another's.

colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

When considering summary judgment motions, courts must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). In reviewing the whole record, the Court must remember to "disregard all evidence favorable to the moving party that the jury is not required to believe" and therefore only "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that [the] evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## DISCUSSION

The FLSA requires that an employee receive overtime pay if he or she works more than forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA, however, exempts from this requirement "any employee employed in a bona fide executive…capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations which further describe and interpret the scope of this exemption. Due to the time span of Belford's claims, two different sets of DOL regulations apply to this analysis: the regulations in effect prior to August 23, 2004 (the "pre-2004 regulations"), and the regulations that went into effect on August 23, 2004 (the "current regulations").

The pre-2004 regulations set forth both a "short" and "long" test for determining whether an employee qualifies as an exempt executive. *See* 29 C.F.R. § 541.1 (pre-2004). The short test

is used for employees who are compensated on a salary basis at a rate of at least $250 per week.[6] 29 C.F.R. § 541.1(f) (pre-2004). Under the short test, an employee qualifies as an executive if (1) her primary duty consists of the management of the enterprise and (2) includes the customary and regular direction of the work of two or more other employees. 29 C.F.R. § 541.119(a) (pre-2004); 29 C.F.R. § 541.1(f) (pre-2004).

Similarly, the current regulations provide that an employee qualifies as an executive if: (1) she is compensated on a salary basis at a rate of at least $455 per week; (2) her primary duty is management of the enterprise; (3) she customarily and regularly directs the work of two or more other employees; and (4) she has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

The DOL has also promulgated additional regulations which further describe and define these factors; the additional regulations are discussed below. Because Belford's claim covers the period between February 9, 2004 and February 2005, it is governed, in differing degrees, by both the pre-2004 and the current regulations. The application of the different regulations, however, is not material to the outcome of this case.

**1. Family Dollar Satisfies the Salary Basis Test**

Between February 8, 2004 and February 21, 2004, Belford was paid a salary of $722.80 per week. (Doc. No. 215, Sundberg Decl. ¶ 4.) He then received a pay increase to $744.69 per week which he received throughout most of the remainder of his employment with Family

[6] The "long" test found in the pre-2004 regulations includes six factors. Section 541.1(f) states clearly, however, that an employee who is compensated for her services on a salary basis of at least $250 per week and who satisfies the tests promulgated by sections 541.1(a)-(b) shall be deemed to meet all other requirements under that section. 29 C.F.R. § 541.1(f) (pre-2004).

Dollar. (*Id.*) The only exception was between October 2004 and January 2005 when he earned $950 per week. (*Id.*) Therefore, Family Dollar satisfies the salary basis test under both the pre-2004 regulations, which require a weekly salary of not less than $250 per week under the short test, and the current regulations, which require a weekly salary of not less than $455 per week. 29 C.F.R. § 541.1(f) (pre-2004); 29 C.F.R. § 541.100.

**2. Family Dollar Satisfies the Primary Duty Test**

The regulations provide guidance as to how an employee's primary duty may be determined. Both sets of regulations instruct that the determination should be "based on all the facts in a particular case." 29 C.F.R. § 541.103 (pre-2004). The pre-2004 regulations set forth five factors to consider in this analysis: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the employee exercises discretionary powers; (4) the relative freedom from supervision; and (5) the relationship between the manager's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103 (pre-2004).[7]

Upon consideration of the five factors identified for determining whether Belford's primary duty was management, the Court concludes that the factors are readily satisfied.

**a. The Amount of Time Spent in Performance of Managerial Duties**

Belford cannot overcome the exemption by claiming he spent the majority of his time performing non-managerial duties. Both sets of regulations state that an employee who spends more than fifty percent of his or her time performing managerial work will typically satisfy the

[7] The current regulations omit reference to the frequency with which the employee exercises discretionary powers. 29 C.F.R. § 541.700.

primary duty requirement. 29 C.F.R. § 541.700(b); 29 C.F.R. § 541.103 (pre-2004). The regulations, however, also emphasize that "time alone…is not the sole test" and that exempt executives are not required to spend more than fifty percent of their time performing exempt work if other factors support the conclusion that management is their primary duty.[8] *Id; see also Grace,* 637 F.3d at 515.

Both sets of regulations provide an almost identical list of "management" activities, which include, but are not limited to:

> Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property.[9]

29 C.F.R. § 541.102(b) (pre-2004).[10] Belford testified that he regularly performed almost every one of these management activities as a Family Dollar store manager.[11]

---

[8] The Court disagrees with Belford's contention that failure to meet the 50 percent threshold means that an employee fails to satisfy the primary duty requirement. The Fourth Circuit clarified the application of the 50 percent "rule of thumb" by stating that, "[i]t is clear from this language that primary duty is meant to be assessed by the totality of the circumstances." *Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003).

[9] An employee need not perform all management duties listed in the regulations, or even regularly perform such duties, in order to be considered an exempt executive. *See Aguirre v. SBC Communs., Inc.*, 2007 U.S. Dist. Lexis 72666 at * 63-62 (S.D. Tex. Sept. 30, 2007) (finding that "plaintiffs' 'primary duty' for purposes of the executive exemption was 'management,' despite the fact that the plaintiffs did not perform other 'managerial' duties listed in Section 541.102.").

[10] The current regulations include two additional examples: planning and controlling the budget and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102.

[11] The fact that the assistant managers can perform the same tasks as Belford does not render his tasks and duties any less managerial. Courts have consistently held that the fact that a non-exempt employee may sometimes perform exempt duties does not make these duties any less exempt/managerial. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) ("[t]hat the [non-exempt] assistant managers may have performed some managerial tasks

The current regulations specifically address the concept of concurrent duties. 29 C.F.R. § 541.106. Concurrent performance, or multi-tasking, of exempt and nonexempt work is explicitly recognized as a managerial duty by the DOL's regulations. *Id*; *see also* 29 U.S.C. § 213(a)(1).[12] "It is misleading simply to add up the time that [Plaintiff] spent unloading trucks, stocking inventory, running cash registers, or sweeping floors and conclude thereby that she was merely a clerk and not a manager." *Grace,* 637 F.3d at 516.

In *Grace*, the Fourth Circuit found the plaintiff "was performing management duties whenever she was in the store, even though she also devoted most of her time [99%] to doing the mundane physical activities necessary for its successful operation." *Id.* at 517. Similar to the plaintiff in *Grace*, Belford contends that he devoted 75-80% of his time to performing nonexempt work, but he was also responsible for the overall management of the store for the entire time he was in the store. (Doc. No. 215, Belford Dep. at 35, 224.) Despite the fact that he may have been doing manual tasks, Belford admits that he was always "top dog" in the store and was managing the store at all times, even though he may not feel like he was. (*Id*. at 87, 140-41.) While Belford argues that management was not his primary duty because he spent a majority of his time engaged in manual labor, the regulations and the court in *Grace* clarify that performance of these duties, in conjunction with overall supervision and management of the store, is not contrary to the application of the exemption.

**b. The Relative Importance of the Managerial Duties as Compared with Other Types of Duties**

---

does not render the tasks non-exempt.").

[12] The FLSA recognizes the nature of retail business and states that "an employee of a retail or service establishment shall not be excluded from the definition of an employee employed in a bona fide executive or administrative capacity because of the number of hours in her work week which she devotes to activities not directly or closely related to the performance of executive or administrative activities." 29 U.S.C. § 213(a)(1).

Belford's managerial duties were more important than the other duties he performed because they were critical to the operation of the store. In *Grace*, the plaintiff's managerial tasks, which included filling out paperwork, addressing customer complaints, working with employees on their schedules, and collecting cash, were critical to the operation of the store, as there was "*no one else at the site to direct these actions*." *Grace*, 637 F.3d at 517 (emphasis in the original). Similarly, Belford's managerial tasks, which included training employees (Doc. No. 215, Belford Dep. at 113), apportioning hours to employees (*Id*. at 137), maintaining sales records and ensuring the accuracy of payroll records (*Id*. at 99), and promoting store safety (*Id*. at 112), were critical to the operation of the store. While Belford argues that he was under the direct supervision of the district manager, he nonetheless stated that his district manager came to the store only about three times a month – not enough time to direct the managerial tasks. (*Id*. at 138.) Therefore, the store could not have operated successfully without the managerial functions performed by Belford.

**c. Frequency With Which the Employee Exercises Discretionary Power**

Belford exercised discretion virtually every day and all day long in his capacity as store manager. Belford decided how to interview applicants (Doc. No. 215, Belford Dep. at 164-65); how to adjust the schedule (*Id*. at 137); how to conduct performance evaluations for employees and assistant managers (*Id*. at 198-200, 209-10); and how to apportion work among the employees (*Id*. at 143); while at the same time, satisfying customers. All of these tasks involved "discretionary acts inherent in being responsible for the successful operation of a retail store." *Grace*, 637 F.3d at 517. Moreover, although Family Dollar maintains certain policies and

procedures for the sake of consistency, Belford exercised discretion in deciding how to execute these policies and procedures.[13]

### d. Relative Freedom from Supervision

Relative freedom from supervision does not demand compete freedom from supervision. In *Grace*, the plaintiff's supervising district manager typically visited the store once every two to three weeks. *Grace*, 637 F.3d at 517. The court also noted, apart from her supervision, which was not uncharacteristic for any retail operation, the district manager was not a "micro-manager who constantly was looking over [the manager's] shoulder." *Id*. The supervision of seventeen stores would hardly permit [the district manager] to micro-manage all of them. *Id*. Moreover, courts have found that an employee's "frequent, even daily exchange of e-mail and phone communications with her district manager" did not equate to exacting supervision. *Thomas*, 506 F.3d at 508.

Belford was relatively free from supervision during the relevant time period. During the majority of Belford's time at Family Dollar, Penny Sundberg was his district manager. Belford testified that Sundberg only visited his store about three times a month. (Doc. No. 215, Belford Dep. at 138.) Belford also testified that he spoke on the phone with Sundberg daily. (*Id*.) The infrequency of the district manager's visits and the number of phone conversations does not equate to exacting supervision. *See Thomas*, 506 F.3d at 508.

Additionally, Family Dollar's records indicate that Sundberg was responsible for 19 stores across a dozen counties. (Doc. No. 215, Sundberg Decl. ¶ 3.) The district spanned

---

[13] *See Murray v. Stuckey's, Inc.*, 50 F.3d 564, 570 (8th Cir. 1995) (*Murray II*) (standardized procedures and policies may circumscribe but do not eliminate discretion of on-site store managers); *Thomas v. Speedway SuperAmerica LLC*, 506 F.3d, 496, 507 (6th Cir. 2007) (manager still exercised discretion on a daily basis even though store had standardized operating procedures); *Grace*, 637 F.3d at 516 (manager still exercised discretion even though she was subject to company policies and the company template for a store in the Family Dollar chain).

approximately 102  miles north to south, and approximately 94 miles east to west.  (*Id.*)  The large territory and number of stores Sundberg was responsible for supervising did not allow her to micro-manage each individual store.  *See Grace*, 637 F.3d at 517.

**e. Relationship Between Salary and Wages Paid to Other Employees for the Kind of Nonexempt Work Performed by the Supervisor**

To determine the relationship between a managerial salary and wages paid to nonmanagerial employees, the Fourth Circuit considered, first, whether the manager earned more, in absolute terms, than nonmanagerial employees and, second, whether the manager was a "profit center."  *Id.* at 517.  This second consideration asks whether the manager had the ability to influence the amount of his compensation.  *Id.*

As to the first consideration, Belford earned significantly higher amounts on an hourly basis than nonexempt workers.  The record shows the hourly employees working at Belford's store, even using the highest wage for those employees whose wages changed over time, received an average hourly wage of $6.40 per hour.  (Doc. No. 215, Sundberg Decl. ¶ 7.)  In comparison, Belford worked an average of 54.49 hours per week.  (Doc. No. 784, DeBrocq Decl. ¶ 4.)   Belford earned compensation which, when computed on an hourly basis, averaged between $13.26 per hour ($722.80 per week), $13.67 per hour ($744.69 per week), and $17.43 per hour ($950 per week).

As to the second consideration, Belford was a "profit center;" his performance evaluation, salary, and bonus depended on his store's profitability.  *See Grace*, 637 F.3d at 517. Belford earned bonuses of $587.60 in 1999, $659.61 in 2000, $85.03 and $2,633.07 in 2001, $3,186.56 in 2002, $3,330.15 in 2003, and $3,628.88 in 2004, bonuses for which nonexexempt employees were not eligible.  (Doc. No. 215, Sundberg Decl. ¶ 9.)  A review of these

calculations and comparisons reveal a significant difference in wages between Belford and his nonexempt employees.

### 3. Customary and Regular Direction of the Work of Two or More other Employees

To qualify as an executive, the regulations require an employee's primary duty to include the "customary and regular direction of the work of two or more other employees." 29 C.F.R. § 541.119(a) (pre-2004); 29 C.F.R. § 541.100(a)(3). The pre-2004 regulations do not further define the terms "customary and regular," but the current regulations state that the phrase "means a frequency that must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701. The DOL has adopted an "80-hour rule" which generally requires an exempt executive to direct a total of eighty employee-hours of work each week. *See* 69 Fed.Reg. 22135; *see also Grace*, 637 F.3d at 513 (holding that Grace customarily and regularly directed the work of two or more other employees who worked eighty or more hours per week during 89.23% of the weeks that she was store manager). Family Dollar's records reflect that Belford managed at least 80 employee hours 98.15% of the time he was a store manager during the relevant time period. (Doc. No. 215, Sundberg Decl. ¶ 6.) Therefore, Belford customarily and regularly directed the work of at least two full-time employees and satisfies this factor.

### 4. Authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight

Finally, the additional prong of the executive exemption test contained in the current regulations states that an exempt employee has authority to hire <u>or</u> fire other employees <u>or</u> her recommendations as to the hiring, firing, advancement, promotion, <u>or</u> any other change of status

of other employees are given particular weight. 29 C.F.R. § 541.100(a)(4) (emphasis added). The DOL provides guidance with respect to whether an employee's recommendations satisfy this standard. Specifically, the "factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Importantly, the employee's recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status."[14] *Id.*

Belford's recommendations for hiring, firing, and change of status were given particular weight. With respect to his recommendations for hiring, Belford testified that he was actively involved in the interviewing and employee screening process, administering applicant tests, and ensuring that all pre-employment drug screening and paperwork were properly completed. (Doc. No. 215, Belford Dep. at 109, 164-65, 167, 169, 174-75.) With regard to change of status, Belford made recommendations to his district manager regarding promoting or demoting employees, which the district manager often followed. (*Id.* at 152-53, 226-27.) With respect to terminations, Belford testified that he completed separation documents and was involved in employee terminations. (*Id.* at 216-18.) Therefore, Belford's recommendations for hiring,

[14] *See Davis v. Family Dollar Stores*, No. 3:03-0170 (D.S.C. Sept. 28, 2004) ("the record shows that plaintiff had considerable influence in the hiring and firing of employees in her store even though they ultimately had to be approved by higher management"); *Lovelady v. Allsup's Convenience Stores, Inc.*, 304 Fed.Appx. 301, 305-06 (5th Cir. 2008) (managers who did not have ultimate authority still satisfied test where they made recommendations which were almost always followed); *Grace*, 637 F.3d at 514 (manager's suggestions regarding the hiring of employees were given significant weight when the district manager followed those recommendations 95% of the time).

firing, and change of status were given particular weight and each independently satisfies this factor.

## CONCLUSION

Looking at the facts in the light most favorable to the non-moving party, the Court finds that Family Dollar has satisfied the DOL regulations qualifying Belford as an exempt executive under the FLSA. No reasonable jury could find otherwise. Therefore, Family Dollar is entitled to judgment as a matter of law.

## ORDER

IT IS ORDERED that:

(1) Defendant's Motion for Summary Judgment (Doc No. 214) is GRANTED and Plaintiff Jewell Ray Belford is dismissed;

(2) The Court finds that there is no just reason to delay finding of final judgment for Family Dollar with regard to Plaintiff Jewell Ray Belford's claim against Family Dollar;

(3) The Clerk is directed to enter final judgment, pursuant to Rule 54(b), for Family Dollar with regard to Plaintiff Jewell Ray Belford.

**SO ORDERED.**

Signed: August 16, 2012

Graham C. Mullen
United States District Judge